## Lewis *against* Lewis.

Testator in 1728 devised his plantation to his son J. W., provided it should be valued, and he to pay the value to his daughters within 12 months after the valuation, and appointed his brothers trustees of his daughters' legacies. One daughter survived, and the trustees were appointed her guardians. A receipt, dated in 1730, by the trustees, to T. W., grandfather and guardian of J. W., of the amount of the valuation of the plantation, found after the lapse of 100 years among the papers of J. W., in the drawer of a desk known for 36 years to contain his papers, and remaining in the possession of the descendants of the person in whose house he died in 1760, was *held* to be evidence to show title.

So a lease by J.W., dated in 1740, found under the same circumstances, was *held* to be evidence.

And also a draft, purporting to have been made in 1717, and handed down through the office of his successors, the handwriting being proved by some of his descendants, who had seen much of his handwriting, to be the same with other official papers written by him.

Possession follows title, unless there be adverse occupancy.

**ERROR** to the Common Pleas of *Bucks* county.

This was an ejectment brought by John Lewis against Charles Lewis, in which a verdict and judgment were rendered for John Lewis, the plaintiff below and defendant in error.

The facts of the case are fully stated in the opinion of the court.

*Wright* and *Chapman,* for plaintiff in error, cited 3 *Johns.* 292; 1 *Stark. Ev.* 345; 9 *Johns.* 169; 10 *Ib.* 475; 6 *Binn.* 435; 1 *Bay.* 374; *Co. Lit.* 6; 14 *Mass.* 237; *Bull. N. P.* 256; 1 *Day* 364; 2 *Bac. Ab.* 648; 1 *Phil. Ev.* 182; 2 *T. R.* 55; 3 *Har. & M'Hen.* 581; 1 *Har. & Johns.* 174.

*Ross, contra,* referred to 1 *Stark. Ev.* 54, 330; 6 *Binn.* 421; 4 *Serg. & Rawle* 466; 1 *Dall.* 14; 5 *Watts* 209; 1 *Watts & Serg.* 533.

The opinion of the Court was delivered by

Huston, J.—It appeared that Thomas Watson, in 1713, obtained a patent for 440 acres of land; that he divided the same into three parts, of which his son John had one part, his son Thomas one part, and Thomas retained and lived on the middle portion until his death, about 1731. There were no deeds shown from Thomas to his sons; but it seemed clear the original tract was occupied as three separate farms as far back as any account could be given. This dispute related to the part allotted to Tho-

[Lewis v. Lewis.]

mas, the son, who made his will in 1728, proved 22d of May 1729. The material part of said will was as follows: "Item, I give and bequeath to my well-beloved wife, Elizabeth, my whole estate, both real and personal, to her own proper use, so long as she remains a widow, for the bringing up of my children; but if she marry, I will that she have only one-third part of my personal estate, and my best bed with its furniture, to hold the same to her own proper use and behoof for ever. Item, I will that my son John have the full power of my plantation and real estate, at either the marriage or death of his mother, to dispose of it as he will, provided, that it be valued at the time when he enters upon it, and he pay the value thereof to my three daughters, Eleanor, Mary, and Sarah, within twelve months after the said valuation, to be equally divided amongst them, or so many of them as shall then be living." After some directions in case his widow married before his son came of age, and appointing his wife executrix of his will, he continues: "I do also constitute and appoint my beloved brothers John Watson and William Smith trustees of this my last will and testament, giving and hereby granting unto them, my trustees, full power and authority in case my said wife should happen to die or marry before my children arrive at the age of 21 years as aforesaid, to take care of my said children and the legacies hereby to them granted, and put it to the best advantage for my children's use, and also to assist and advise my beloved wife,"&c. &c.

On the 8th of June 1730, John Watson and William Smith were appointed guardians of Sarah Watson, the petition stating the death of her sisters Eleanor and Mary. But, on the 20th of March 1729–30, a receipt was given by John Watson and William Smith to old Thomas Watson in these words: "Received of Thomas Watson, Dr. guardian to John Watson, son of Thomas Watson, Jun., deceased, the sum of £50 for the use of Sarah Watson, daughter of the said Thomas Watson, deceased, it being a value put upon her father's plantation at her mother's death, according to his will, received in manner following, viz: £30 by his obligation; £20 in discount; £5 part thereof being a legacy given the said John Watson by his father's will, and £15, the other part being a double share of his mother's thirds; all which we do hereby acknowledge to have received in full."

It would seem, then, that the widow and two daughters died soon after Thomas, Jun., and this paper would seem to contain a full settlement of the will and estate. At the same time the above receipt was offered in evidence, a draft of the land in question purporting to have been made in 1717 by John Chapman, surveyor; and it was proved by several persons to be in the same handwriting with other official papers by John Chapman, handed down through the office of his successors, surveyors; and by some descendants of his, who had seen much of his handwriting. At the same time was offered a lease by John Watson, Jun., to John

Thomas, for a tract, being the south part of his land, dated 1740. It was proved that John Watson, the devisee of Thomas Watson, Jun., and known as John Watson, surveyor, was never married; that he died about 1760, at the house of a Mr Blackfan; that the three last mentioned papers were found in a drawer of a desk containing papers of John Watson, surveyor; that for 30 years that drawer had been known in the family of Blackfan's descendants as a drawer containing papers of John Watson, surveyor, deceased. They were all objected to, but admitted; they were rightly admitted. Old Thomas Watson, in the receipt above, speaks of the valuation of Sarah's father's plantation and its valuation, and the receipt is for the price of it. The transaction was between the grandfather of John and Sarah and the trustees of the will of Thomas Watson, Jun. It and the draft of the land were the evidences of title and extent of the property. The will gave it to John on his paying the valuation, and this paper showing the valuation and payment of it to Sarah, being found among the papers of John after the lapse of 100 years, or even of one-fourth of that time, were evidence of his right to the land. The description of the land in the lease was not very precise, but the court, on the lease and the parol evidence, left it to the jury. The title being in John Watson, the possession was in him, unless evidence of adverse occupancy.

John Watson made his will on the 8th of November 1760—proved 1st of September 1761. His sister Sarah had married a man named Lewis. The will was: "After full payment of my funeral expenses and just debts, I give and devise all and singular, my land, tenements, and hereditaments, to my sister's son John Lewis in fee tail male; and for default of male issue in his line, I will the same to my cousin Joseph Watson, in fee, charged with the payment of £10 per annum to my sister Sarah Lewis, whilst she shall remain a widow, if at any time or times she shall so happen to be," &c. Then follows a clause giving it over if his nephew shall attempt to suffer any fine or recovery: "And if they decline payment of the above annuity upon the terms above expressed, then I will that my said cousin Joseph Watson, or his right heir, enter immediately upon the said devised premises, and hold the same in fee-simple, charged as aforesaid." John Lewis entered and resided on the land, or occupied it by his second son Charles Lewis, until 1837, when he died. John Lewis, the plaintiff, is the oldest son. Charles defended under the will of his father, who had devised it as if he had been the owner in fee-simple.

This cause had been tried before, and before the receipt and draft and lease were found. The court on this trial gave a charge, all of which was according to law. As is now very common, the counsel of Charles Watson proposed a long string of propositions to the court, which the judge answered as follows:

[Lewis v. Lewis.]

1. We are requested to charge you, " That Sarah Watson having survived John Watson, surveyor, the plaintiff cannot recover under the will of said John Watson, unless there is positive and unequivocal proof of purchase and perfection of title from Sarah to him." The proof must be such as will satisfy the conscience of the jury. The land was devised by Thomas to his son John ; he was to pay his sisters. The receipt is evidence of a valuation and a family arrangement. The trustees had full power and authority to take care of the children and the legacies granted. The receipt shows that John's guardian received the valuation. The trustees of Sarah are likewise trustees for John, and the presumption of law is that the valuation was paid.

2. " That the receipt bearing date 29th of March 1729–30, cannot be received as evidence of payment to Sarah of the consideration money, as the receipt is antecedent in date to the appointment of the trustees, and to the date of proof of Thomas Watson's (Jun.) will." We think the receipt is evidence of payment, for by that receipt the trustees got the thirds of the widow which belonged to John for the use of Sarah for £15. The evidence shows that it is not true in point of fact, that the receipt is anterior to Thomas Watson's will, of which the jury are the judges.

3. " That the trustees of Sarah Watson have charge only of the personal estate of Sarah, and any sale of her real estate therefore, made by the trustees during her minority, was subject to be disapproved upon her arriving of age, and therefore in the absence of positive proof that she assented to the sale and perfected the title at her majority, the jury may presume it was not done."

4. " The plaintiff should have proved that John Watson, surveyor, ratified the valuation of the land, made during his minority, after he came of age, and also that he then accepted to take it at such valuation under his father's will ; and in the absence of such proof the plaintiff is not entitled to recover, as the jury cannot presume that he did so." There was no land devised by her father to Sarah ; the land was devised to John, or rather full power over it, subject to a valuation and payment. The receipt shows that valuation was made, and the estate settled by the trustees. The £5 legacy to John accounted for £15, paid to the trustees in the thirds of the widow. Dr Thomas Watson, John's guardian, receipted for £30 to the trustees for the use of Sarah ; this they had power to adjust under the will of Thomas Watson, Jun. or 2d. The trustees had charge of the legacies under the will. The land was not devised to Sarah, only money arising out of land ; under the evidence in this case it was not necessary to prove a confirmation by either Sarah or John after they came of age.

5. " The plaintiff has not proved, that the widow of Thomas Watson, Jun. either died or was married again prior to his children coming of age, and consequently the trustees had no authority

[Lewis v. Lewis.]

over the estate, and any action of theirs cannot give title to the plaintiff." This point is put in opposition to the evidence of which the jury are the judges; the receipt recites the death of the widow and the distribution of her effects; we cannot instruct you as required.

6. "Unless it be shown that John Watson, surveyor, went into possession under the contract between his guardian and the trustees of Sarah Watson, or held possession under the same, no recovery can be had." Whether the lease applies to this land, we have left as a fact for the jury, and we have instructed the jury in our general charge that title gives constructive possession. We refuse to instruct as required.

7. "That the equitable fee in this land was not in John Watson until he paid the valuation money, but in the sister." This has been answered fully in the general charge and in answer to the other points. Admitting the fact that the equitable fee was not in John Watson, we submit to the jury whether there is not satisfactory evidence on the principles as here stated of the appraisement and payment of the money.

8. "That the agreement between the guardians was merely inchoate, and there is not sufficient evidence how it has been ratified." We have admitted the receipt in evidence. That receipt is plain, clear, and explicit, and taken in connection with the draft, we look upon it as deciding the case, and it does decide it so far as to vest the property in John Watson, surveyor. It is a written paper, and if you find it relates to this land, in our judgment, taken in connection with the will of Thomas Watson, Jun., it does vest his land in his son.

The judge on this having stated that the eldest son must recover an estate in tail, and that the law was with the plaintiff, if the jury found the draft, receipt and'lease related to this land, left these facts to them, and they found for the plaintiff.

Judgment affirmed.